Good morning, may it please the Court, and that's Richard Federal Defenders on behalf of Appellant Grande. This Court should reverse Mr. Grande's conviction and remand with instructions that the District Court not use his fingerprints at any subsequent proceeding because the District Court erred both in denying his motion to dismiss based on an invalid removal and in denying his motion to suppress fingerprints that were taken following an unlawful arrest. I'll speak first to the issue of the motion to dismiss since this Court issued a controlling decision on that issue just one week ago. The government could not constitutionally have charged Mr. Grande with the crime of illegal reentry because there was no independent, valid order of removal on which the government could have relied as a predicate to that illegal reentry charge. Why don't you just tell us how all this came about? Because people in the audience would like to know. It's very interesting. I'm sorry, Your Honor, how what came about? What? How what came about. I apologize. The facts of the case. Sure. Yeah. The facts is pertinent to the motion to dismiss and motion to suppress. I'll just sort of lump them all in one. It was Mr. Grande was arrested out near a campground site and sort of some miles from the border, somewhat near the town of Imperial, California. He was arrested when a Bureau of Land Management officer stopped him and a companion walking on a road towards Imperial and towards El Centro, California, detained. What the officer said was on suspicion of public intoxication. And then after that detention, Border Patrol arrived and arrested him. That was his arrest. If we go back to June of 2011, a little bit before that, his removal. It was at night. It was at night during the arrest, yes, Your Honor. And they were walking to El Centro. Or Imperial, the nearest town. What was the nearest town? Imperial? Twelve miles away. Did they say they were going to El Centro? They didn't specify where their destination was. Mr. Grande said only that he had left a camping site because he had gotten in a fight with his girlfriend and that he was headed to the nearest town to seek lodging. The Bureau of Land Management officer who stopped him said that the nearest town was El Centro. That was inaccurate. The nearest town was actually Imperial. But it was more sort of in conjunction with this kind of exploratory questioning of Mr. Grande and his companion to see what they were doing, what they were up to out near the campground on this dirt road where they were walking. After having this sort of brief exchange in which Mr. Grande said this. What time of the night was this? Near midnight, I think. Near midnight? Yes. From my recollection of the record, I can check. How far away was the closest town? Twelve miles, I believe, was Imperial. The district court said maybe around 15 miles, somewhere in that neighborhood. The town was pretty far away. These questions were considered by the district court, Your Honor, just to kind of get to what I think was. Was the moon out that night? I couldn't tell you for sure. Abraham Lincoln would have known. I can only aspire to do that as truth. Acknowledging that shortcoming, I think the district court did actually consider. I don't know whether the moon figured into his calculus, but he did consider the circumstances of arrest. He held that Mr. Grande was arrested unlawfully because there was no objective, particularized basis on which to detain him. The district court after that ordered suppression of all evidence that was the fruits of that unlawful arrest, which included statements, photographs, and ultimately fingerprints. The district court after that contradicted its suppression order in the sole respect that the district court allowed the government to get a new set of fingerprint exemplars and use that set in proving the illegal reentry charge at trial. I had intended to speak to the removal issue, but while we're on it, I'll get to the suppression issue now. What did the district court find about the legality of the stuff? The district court found that the BLM officer violated his Fourth Amendment rights because there was no particularized, objective, articulable, reasonable suspicion on which he could have been detained. That was a finding supported by the record, and it's not in dispute on this appeal. The only dispute goes to the remedy for that Fourth Amendment violation. The remedy is suppression, and on this issue, the remedy Mr. Grande is seeking is extraordinarily narrow. Mr. Grande is not seeking to suppress his identity. He is not seeking to suppress his A file, and he's not seeking to advance any theory that would prevent the government from bringing him to trial on the illegal reentry charge against him. You're also appealing the motion to dismiss ruling, right? I am. So if you prevail under the circuit's recent case of Riavaca, is there a reason for this panel to reach the other issue, the suppression issue? There is, Your Honor. There are a couple reasons why the Court should nonetheless reach the suppression issue. The first one is that the government routinely, when a person, when a motion to dismiss is granted based on an invalid removal, the government routinely supersedes with what is essentially a lesser-included charge of illegal entry, wherein the government does not have to prove a prior removal. So once you take out that element from the charge, the charged crime, the motion to dismiss based on invalid removals no longer affects the government's charging capacity. Likewise, if the Court, depending on the nature of the Court's holding, if the Court demands for an evidentiary hearing on the factual dispute here, certainly the district court could, following that evidentiary hearing, find that there was due process violation anew, in which case certainly the trial prospect would remain, and the district court's  So the, I'll speak very briefly to the order of removal, and then I'll return again to the fingerprints. Speaking to the order of removal, the 2000, there's only one removal that was entered against Mr. Grande before this prosecution, and it was a 2011 removal order that stemmed from expedited removal proceedings where agents violated his rights. That they violated his rights is clear from United States v. Ryabaka. Judge Nguyen just discussed this case. This case came out last week, and what it held was due process requires immigration officials at an expedited removal proceeding to read, to inform an alien of the charge against him, to permit that alien to respond to the charge in a sworn statement, and then to read that sworn statement or have it read to him before he affixes his signature, which affects his summary removal from the country. Agents did not do that in this case. Just as in Ryabaka, Mr. Grande alleged in his motion to dismiss that they simply handed him a stack of papers, told him to sign some of them, and then summarily removed him from the case. Well, he did put his initials. He did, Your Honor, as the defendant did in Ryabaka. On the final page where there was a jurat, a sworn statement, that said the whole thing consisted of only one page when it actually consisted of four. That's the same in this record. He signed there, and the district court found that he also signed a notice of charge statement. But the facts are basically identical in Ryabaka, where this court discounted the significance of those signatures given the declaration, sworn declaration and averments in the motion to dismiss that said, I didn't understand the charge. They just handed me some papers and told me to sign them, and that was the end of the process. That's all the process that was afforded Mr. Grande, and so for the same reason what we have here, the client and another gentleman are out for an evening walk in the desert, and they're stopped by a BLM officer, right? Yes, Your Honor. And he asks them some questions, and then he handcuffs them. That's right. And that arrest was illegal. That's right. That's what the district court held. But then the judge so held, but then on the motion that was made, the judge then held that the fingerprints that were taken of him were the fruit of the unlawful arrest. He did. So they were kept out. That's right. But then he turned around in the next breath and said, well, all right, those were illegal. Now you give them another set of fingerprints. That's right. And that's what happened. That's right, Your Honor. And he did so without finding that there was any intervening event that had purged the taint of the initial arrest. Yes, that's what happened. All right, so he did give those fingerprints. The second set. Second set. That's right. Then they were able to identify him through the prints, right? They identified him, and also the holding was they could use those as evidence of trial. Yeah, well, they identified him, and they got his A-file. They had his A-file already, Your Honor. The fingerprints enabled, at trial, the connection to the A-file with that individual defendant. That evidentiary link that the fingerprints served is where the exclusionary rule was violated. The government, under this Court's precedent, and we don't have any beef with this, the government may use fingerprints, even if they're unlawfully obtained, and even unlawfully obtained for an invalid purpose, like serving as evidence. It may use them to identify an alien and bring him to trial. It may use them to compare them to the A-file, identify the person as not in the country with lawful authority, and on the basis of that information, bring him to trial. That's this Court's holding in Garcia Beltran in 2006, the second one, and Ortiz-Hernandez, on which it was based. And the case is going all the way back to a 1994 case, United States v. Guzman Bruno. That's the basic, that's the contours of the no suppression of identity rule this Court has developed. Why don't you tell me your argument? You know, you give us a lot of information. You go on and on. But say you've got a minute to tell us what your argument is. What would you say? Yes, Your Honor. I'm interested in it, you know. I am, too. Very interested. The core of the exclusionary rule. Abraham Lincoln would be interested in that. I agree. And that much we can share. Yeah. The core of the exclusionary rule says that when agents arrest someone in violation of the Fourth Amendment and they take that person's fingerprints for the purpose of getting evidence against them, the government can't benefit from that lawlessness by introducing them as evidence at trial. Okay. That's the holding of Davis v. Mississippi. It's a holding the first Garcia Beltran won. Yeah.  That's what the District Court permitted here that violated the Supreme Court's precedent. It's hard for you to get around Ortiz-Hernandez, though, isn't it? Your Honor, only in the sense that there's language in Ortiz-Hernandez and there's language in Garcia Beltran 2, rather, the second one, that is rather broad. But certainly there's no way to read those cases as conflicting with Davis v. Mississippi vying Supreme Court precedent and the predecessor Garcia Beltran 1 from this court, which, again, was antecedent, was before Ortiz-Hernandez. Because the use of the second set of fingerprints were allowed to be admitted at trial in Ortiz-Hernandez. Not as evidence, Your Honor. The Court's holding, if you – if one reads it carefully, says simply that there are quotes that show you what Ortiz-Hernandez was concerned with. This is a quote. Were we to conclude that having discovered and identified the defendant, the authorities are prevented from bringing him to trial, he could be effectively granted a form of judicial immunity. That's what the Court was concerned with. That's what all of these decisions are concerned with. This kind of causation-based theory that you wouldn't have discovered that I'm an unlawful alien but for this unlawful arrest. And so you essentially have to let me go. You can't introduce anything that results from that unlawful arrest. That broad theory is what was rejected. And I rejected it. That was not the theory of suppression. It was rather the next step, evidence. That's what the exclusionary rule is concerned with. It's not identity but evidence. And I said that evidence can't be admitted against Mr. Grande. The same way you can't introduce fingerprints to connect a rape defendant in Davis to the scene of the rape, that independent event of evidentiary significance, you cannot use fingerprints here to link Mr. Grande with his physical removal from the United States when he put his fingerprint on a piece of paper. That's another event in the government's investigative aid file, connecting him with That violates the Fourth Amendment. And that's all that the Court held in Ortiz-Hernandez, Judge Nguyen, and in those cases that are the sort of progeny of Ortiz-Hernandez. So the problem that they were trying to resolve in Ortiz-Hernandez concerned articulate it again? It concerned judicial immunity. Someone relying on the causation-based sort of exclusionary rule-like theory that their identity wouldn't have been discovered but for an unlawful arrest and fingerprinting. And so you can't use any evidence. And, indeed, you can't bring them to trial on that charge because of that unlawful arrest. Ortiz-Hernandez, Garcia Beltran won. They all rejected that under the INS v. Lopez Mendoza, which rejected the same thing in the civil deportation context. You can't hide your identity. Certainly not. You have to come to trial. Okay. And so you can't argue that I can't be prosecuted because of what happened at the arrest?  I have very little time, but I'd like to reserve some for rebuttals. Actually, if Justice Kagan can indulge me for a moment, because I really may be treading the same ground, but I'm going to ask you to answer the question again on how we get around Ortiz-Hernandez, because there, that panel permitted the court, permitted the second set of fingerprints to be compelled from the defendant, and that court said a second set of fingerprints taken later after the defendant was indicted under a Section 1326 violation was admissible because it was not taken for investigative purposes. So there, it was admissible at trial. Tell me as succinctly as you can, how do we get around that? That statement speaks only to establishing a defendant's identity at trial. I think that's an artful language that is meant to communicate that you can still bring the defendant to trial, notwithstanding that the only reason you know he's an unlawful alien is the unlawful arrest. You can still bring him to trial and you can still use that A-file evidence since it was already independently gathered, and they can use that A-file evidence to prove that he is an unlawful alien, that he was deported. You just can't use evidence that was gathered unlawfully in the form of fingerprints following the case. So the limits of a 1326 prosecution in this instance, according to the defense theory, is you introduce the set of fingerprints to say, okay, we know he's this person because of these fingerprints, but you can't use that to link it to the A-file. Do I understand your position correctly? That's right, Your Honor, and because the latter is an evidentiary use, and that's what the exclusionary rule is concerned with, that's what you can do, although you can identify him. That's the only conceivable way to read those cases as consistent with Garcia-Beltran 1 and Davis v. Mississippi, because it's not like in Davis if they had taken a second set of fingerprints after indictment and used those to prove that he was at the rave scene, that somehow the taint would have been purged of the initial unlawful arrest. I understand the argument. I've taken you over your time. Thank you. I'll turn it over to Judge Pregerson. Yeah. Good morning. May it please the Court. My name is Brandon Kimura. I represent the United States. Just briefly, Judge Pregerson asked about the circumstances of the arrest, and I think I'd like to elaborate on it a little bit. I don't think it makes sense. Well, the arrest was illegal. It was, Your Honor, but I think that's stipulated. Yes, it is, Your Honor. Yeah. So we go beyond that. Yes. The only – I mean – And then they took his fingerprints. Yes. And that's the fruit of the poisonous tree. Well, actually, no, Your Honor. They were illegally obtained. And – but then the judge said, well, you can take the fingerprints. And again – so they took fingerprints again. Well, yes, Your Honor. All right. So the initial fingerprints, the video, the statements were all suppressed, this fruit of the poisonous tree in this instance. What wasn't suppressed, according to the order, was the government's ability to take a second fingerprint exemplar in this case and then use it for trial. Now, you know, the – Go back with that last sentence that you said, because I spoke too fast. Oh, I'm sorry, Your Honor. Yeah. The – Look at the microphone talking to that. Your Honor, the – as part of the motion suppressed, the initial set of fingerprints taken immediately after arrest, the statements made by the defendant, the video, were all suppressed as fruit of the poisonous tree because of the illegal arrest. Well, what was not suppressed or what was not forbidden, at least, was the ability of the government to go ahead and take a second set of fingerprint exemplars and for that to be used at trial. Now – Does it make sense to you that you would suppress the first set of fingerprints, compel a second set of fingerprints, essentially the same evidence, and then be able to use that second set under the exclusionary rule? Your Honor – Explain the logic of that. It is – I think it is – there's – the problem is I think there is some tension in it, but I think that that is explained through the precedent. I mean, the precedent says that fingerprints, at least the second set of fingerprint exemplars, because it's taken after the arrest, it's not subject – it's not fruit of the poisonous tree. It's what the precedent – this law precedent in this Court has held. And which precedent specifically are you relying on? Garcia Beltran 2. The Ninth Circuit has consistently held that evidence concerning identity of defendant obtained after an illegal police action is not suppressible as fruit of the poisonous tree. That's at 1132 to 1133. Ortiz-Hernandez also takes that position. Again, it goes back all the way through to – Well, counsel's response to that is that certainly identity can't be suppressed. So you could use it to establish who he is and figure out, well, who is this person that we've got in custody? But you can't use it for an evidentiary purpose. So what authority are you relying on specifically? So I want to go back and review it carefully. That stands for the proposition that it's appropriate to use it for an evidentiary purpose. Your Honor, the Garcia Beltran 2 and Ortiz-Hernandez specifically said that. I think you pointed it out yourself. In Garcia Beltran 2, the defendant asserted that the fingerprints were subject to the exclusionary rule and could not be used at trial. The court specifically rejected that argument. Again, that's at 1128 and 1134 within that case. In Ortiz-Hernandez – What's the citation? Yes. 443F3D, 1126, specifically pages 1128 and again at 1134. Well, I'm looking at a Garcia Beltran where we held that illegally obtained fingerprints taken for investigatory purposes must be suppressed. Yes, Your Honor. And that the need to establish identity does not mean that the evidence that leads to the identity of the suspect is automatically exempt from the exclusionary rule, and they're talking there about using it for investigatory purposes. I agree, Your Honor. I mean, if we follow what you say, it's just ridiculous. Well, Your Honor, no. You can arrest someone. The arrest is illegal. You can take their fingerprints. And, of course, you can't use those fingerprints that you took right after that illegal arrest. But the court can order the defendant to produce another set of fingerprints. Then you can go on your merry way and use those. So, you know, so one time it's poisonous, and the other time it's a good healthy pill. Is that what you're saying? Yes, Your Honor. I actually am saying that. Did you go to medical school? I did not, unfortunately, to the disappointment of my parents. All right. Your Honor, Garcia-Beltran I was — and the Court specifically notes this because it also references a later case, or earlier case, Parker-Srosas. But in Garcia-Beltran I, the issue was whether or not the fingerprints taken immediately after arrest were going to — should be suppressed. And that's what the Court was looking at in that instance. It specifically noted that and, in fact, stated that when it said that it distinguished Parker-Srosas, which was an earlier case that allowed a second set of fingerprint exemplars to be taken, it explicitly noted that in this case it was fingerprints taken immediately after arrest. And in Parker-Srosas it was a second set of fingerprints, much like this case, that had been taken and that was allowed. And I understand that it seems illogical, but that is what the case — the history of this — of this — the precedent in this Court is, is that identity is not suppressible and that there is no recourse for a person to suppress their identity, even if it is  And you can — you know, you can use them to find out who this person is, but you can't use it to convict that person of a crime because it was illegally obtained. The first set of — You know, there's a lot of ways that you can — you can get the information without having to take another set of fingerprints. Your Honor, I — I — I disagree with that. Again, I think the — the history, again, told Del Toro-Giudino, this Court held that identity evidence is inherently different from other kinds of evidence, that there is no sanction to be applied in an illegal arrest when it only leads to the discovery of a mass identity. But still, it's different because now you already know who that person is and you can look into who that person is. I think what we're talking about is going one step further and actually utilizing it at trial, you know, as a piece of evidence linking the defendant to the A file. And now that — and I think it's that second portion that we're talking about that really seemed to run counter to the purpose of the exclusionary rule. Yes, Your Honor. And I — I think for a distinction as significant as that, this Court in Fort Garcia-Beltran and Ortiz-Hernandez where it specifically allowed the government to use the evidence at trial, the second fingerprints, it was without any kind of qualification. There wasn't any — in both of those instances, you know, it was — there was understanding that the identity had led to the immigration file, the A file, and that the second set of fingerprints were going to be used and established and used at trial to establish his identity. There was no qualification by this Court that the — it was for some kind of narrow or qualified use within that — within the trial itself. It was pretty plain and explicit in both of those cases that the second fingerprinting exemplars were admissible and were — could be used at trial for — to establish who he was. I understand — I ask counsel this. If the defendant prevails under Raya Vaca, if there was a need to reach the suppression issue, and his response was that yes, because the government would then routinely supersede to add the illegal reentry charge, is that true? Your Honor, I — Is that the general practice of your office? Your Honor, it is — we do charge 1325s within our office. It is — for certain cases, I think this would be one of them. Actually, it would have — it wasn't the practice at the time, but I think it is now our practice that we would offer both the 1326 and the 1325 misdemeanor and allow the defendant, you know, to plead to one or the other. Going forward, he would be indicted on the 1326. But it is true that the deportation, if we — if you overturn it on the most recent case, Raya Vaca, that he could still be potentially susceptible to prosecution under 1325. Obviously, he's not here right now, but should he come — should he return or choose to return? Your Honor, the — with regards to — and moving into the defendant's 1326 demotion, the Raya Vaca conceded liaison points. It is similar to this case. Well, we do have conflicting lines of cases in this circuit. Regarding the deportation issue. Yeah. The use of identity evidence and how far you can go. Do you think Ortiz-Hernandez conflicts with Garcia-Beltran? No. No. I think, again, I think Garcia-Beltran specifically narrows its opinion to the first set of fingerprints. It specifically talks about parties' role sets and distinguishes that from the fact that that was the second set of fingerprints taken after the defendant was indicted and arraigned and was going to be used — that set of fingerprints was going to be used by the government in trial. So, and Garcia-Beltran, too, I think, explicitly states that as well, that Garcia — the first Garcia-Beltran noted that it was only regarding the first initial set of fingerprints that were taken immediately after arrest. Now, you know, I think part of what this Court is concerned about is if there's no — there's no sanction in these cases. And I agree that, you know, the fact that the fingerprints can be taken again means that there's no sanctions with regards to fingerprints. But that doesn't mean there was no sanction in this case and many other cases that we would be trying. The defendant's statements, the video, all of that would have been very useful evidence for the government. And all of that was suppressed. I think that still provides incentive on the part of law enforcement not to abuse the Fourth Amendment of individuals. So I think it's important to narrow this focus to the fact that this is only dealing with fingerprints. It doesn't mean that nothing else would be suppressed in these cases. Now, of course, it has specific — Let's say you couldn't use those fingerprints for investigatory purposes. How would the government have proceeded to prosecute this person? Your Honor, I'm guessing that we would have hopefully called the — obviously we would have called the defendant. The officer's identification of him was not suppressed as part of it. So you could still say that. What did you say? The officer that arrested the individual. Yeah. The defendant. We would have still called him because the fact that he had encountered the defendant was not suppressed. You said, is this the person that you arrested? Yes, exactly. Yeah. Okay. And then we would have — I think we would have had to call — Well, wait. You can use it for identity. So you don't have to call the guy. You can use it to identify. Yes. Yeah. So you don't need to bother that guy from the BLM that's wandering around in the desert. Yeah. We would — It's like the in-court ID you're saying. In-court ID. Yeah. But the only thing we could do was — because, I mean, again, the statements were out. And in any case, he had given a false name. So all he could say was, this is the person that I encountered. He couldn't say who he was, what his name was, or anything along those lines. Yeah. And I guess we would have had to put on evidence of the defendant's photograph from the A-file and say, oh, this is the defendant. This is what it looks like. Maybe we could have found another officer. Though I think it's highly unlikely, given the amount of people these people — these immigration officers run through. Literally thousands would have been able to identify him. But potentially we could have done that. That's what we would have done, I think. So. With regards — moving on to — I've been with CMS a long time. With regards to the deportation issue, I think it's, again, conceivably where RAYVAC was on point. I think the only two distinctions in this case and between this case and that case is that, in our case, the court made findings that there were no due process violations. That case, the government conceded on that. And I think there is a small distinction in the sense that I think the criminal history of the defendant is slightly more significant in this case. RAYVAC, the defendant had misdemeanor for three false ID charges. In this case, the defendant had misdemeanor, corporal injury to a spouse, as well as a DUI conviction. With that, Your Honor, I see I'm almost out of time. Are there any further questions? With that, we would submit. Thank you. Your Honors, the Fourth — the Second, the Fourth, the Eighth, and the Tenth Circuit, most of these since this Court's last decision in Garcia-Beltran II, have all come out and expressed disagreement with this Court on the suppression issue. They've all recognized that while identity cannot be suppressed, it says nothing at all about whether evidence can be used at trial to convict a person. I am very sympathetic. I understand the Court's concern, in particular, as, Judge Nguyen, you've expressed it with Ortiz-Hernandez in its broad language. What I'll point to is, in the passage the Court, I think, was referring to about when it says, a second set of prints later taken after a defendant was indicted were admissible because not — I want you to speak slower. Sorry, Your Honor. You've given me a little bit of time, so I will actually — That's all right. Time, as one great philosopher said, is irrelevant. I don't know if I can subscribe to that entirely. I agree with you. A second set of prints taken later after a defendant was indicted was admissible because it was not taken for an investigative purpose. It just ran words. You read Garcia — you read Ortiz as speaking of the set of fingerprints that was taken when he was re- — when he was rearrested? Your Honor, speaking about fingerprints taken, exemplars, the same has happened here. I am acknowledging that. It's the same sort of procedural progression. They took a second set of fingerprints after indictment, but they did not do it in order to be evidence, and the court didn't allow. If you search through Ortiz and you search through Garcia Beltran, too, there's no statement that says this can be evidence at trial linking him to the A-file. You would — that search would be in vain because to say that would be to directly contravene Supreme Court and prior Ninth Circuit precedent. That's why they don't say that. Your Honor, Judge Nguyen's quote after that quote says, Guzman Bruno was the first real case in 1994 that said — it cited INS versus Lopez Mendoza, which is quite plainly about suppression of identity in the jurisdictional sense, saying you can't even bring me before this tribunal because you wouldn't have discovered my identity but for your unlawful activity. It cites INS versus Lopez Mendoza, Guzman Bruno does, and previous Ninth when an unlawful arrest simply results in identifying a person. You don't need an identity, do you, to bring someone to trial? Your Honor — You know, someone commits an offense, and they won't tell you who they are. And you can't find out who they are. That doesn't preclude bringing that person. You can give them a name. Exactly. And if they were to say — and this is the Kerr-Frisbee doctrine, I think I'm saying that right. Call them John Doe, whatever you want. And you try them, and then you put John Doe, whoever you are, you know, you need to punish him by imprisonment. You put the body in prison. Whether his identity is John Doe or, you know — Well, whatever it is. Just give him his own — give him your — whatever name you want to give him. Right. The idea — and further, he cannot say that all of the stuff you already investigated about me, you have in that investigative file, you wouldn't have connected me to that but for my fingerprint-taking at unlawful arrest, and so forth. None of that can come in. That's what the defendants in Garcia-Beltran II and Ortiz-Hernandez were saying, and the Court rejected that rightly. There's no conflict with the Second, Fourth, Eighth, Tenth Circuits. There's no conflict with Supreme Court precedent. Mr. Kimura talked a lot about tension. Is there an intra-circuit conflict? Not if you read them properly. If you adopt the government's argument, certainly there is. There's no question because they can't be reconciled. But if you read them properly as only saying that you can't suppress someone's identity by giving him — granting him judicial immunity, not being able to bring him out to trial based on the discovery of his identity. If you read them that way, as being limited to that, there's no conflict with Supreme Court or any of those other circuits or Ninth Circuit precedent, which is why that's a reading. The illogic that the government talks about, the tension the government talks about, it's illusory. It doesn't exist when you read those decisions properly. I'm very much out of time. Yeah, well, you know, you're passionate about this subject and probably spent the past 50 years of your life worrying about it. That's somewhat of an interesting — Very interesting. If there are no questions, then I'm done. Thank you. Thank you. All right. Now we go to —
judges: Schroeder, Pregerson, Nguyen